Connie JACKSON, Appellant,

v.

CONDOR MANAGEMENT GROUP, INC., et al., Appellees.

CONDOR MANAGEMENT GROUP, INC., et al., Appellants,

v.

Connie JACKSON, Appellee.

Nos. 89–979, 89–1022.

District of Columbia Court of Appeals.

Argued Oct. 10, 1990.

Decided March 5, 1991.

Ernest W. McIntosh, Jr., Washington, D.C., for Connie Jackson.

Steven M. Levine and Jane K. Hylinski, Washington, D.C., for Condor Management Group, Inc., et al.

Before TERRY and FARRELL, Associate Judges, and NEWMAN, Associate Judge, Retired.*

* Judge Newman was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on February 1, 1991.

1. The court then asked the jury foreman how the jurors had divided. The foreman replied

TERRY, Associate Judge:

Connie Jackson received disfiguring burns from a fire allegedly caused by a malfunctioning stove in her apartment. She sued the owner of the apartment complex, Surry, Ltd., and its managing agent, Condor Management Group, Inc., for negligence. At trial, the defense presented evidence tending to negate the existence of a defect and suggesting an alternative reason for the fire. After lengthy deliberations, the jury deadlocked, and the court declared a mistrial.[1]

A few days later, the defense, having moved orally for a directed verdict during trial at the close of the plaintiff's case, filed a written motion for judgment notwithstanding the verdict, and the plaintiff filed a response. Thereafter the trial court, treating the motion as a "request to enter judgment in accordance with [the defendants'] motion for a directed verdict, upon which this Court had reserved [ruling]," issued an order granting the motion and entering judgment in favor of the defendants. From that order the plaintiff noted an appeal. The defendants then noted a cross-appeal challenging certain rulings by the court during trial, but "only seek[ing] consideration of these issues should the Court of Appeals reverse the trial court's grant of judgment in favor of Defendants."

█ As a procedural matter, it is inaccurate to characterize the trial court's final order as a judgment notwithstanding the verdict, as both parties do, for the obvious reason that there was in fact no verdict. We therefore review that order as one granting a directed verdict under Super.Ct. Civ.R. 50(a).[2] On the merits, we agree with appellant Jackson that there was sufficient evidence presented at trial on every element of her claim, and that the jury could have resolved in her favor the factual issues raised by that evidence. We therefore

that five of the six jurors had voted for the plaintiff and one for the defendants.

2. Our standard of review is the same in either event. *See District of Columbia v. Jones,* 265 A.2d 594, 595 (D.C.1970).

reverse the judgment and remand the case for a new trial. We decline to consider the issues raised on the cross-appeal because they may or may not arise again on remand, and there will be time enough to address them if the case returns to us in the future.

## I

In considering a motion for directed verdict, the court must view the evidence in the light most favorable to the party against whom the verdict is sought. The court "may neither determine issues of fact nor weigh the testimony presented." *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 719 (D.C.1985) (citation omitted); *see Bauman v. Sragow,* 308 A.2d 243, 244 (D.C.1973). Because the judge is not the trier of fact, he or she must deny a defense motion for directed verdict if the evidence, viewed in this light, has established a *prima facie* case for the plaintiff. *Marshall v. District of Columbia,* 391 A.2d 1374, 1379 (D.C.1978). Only when there is no evidentiary foundation on which a reasonable trier of fact could base a reliable verdict is a directed verdict proper. *Papanicolas v. Group Hospitalization, Inc.,* 434 A.2d 403, 404 (D.C.1981). Applying these basic principles, we are convinced that there was sufficient evidence presented at trial which, if accepted as true, would permit the jury to find that the stove had a defect, that the defect was the proximate cause of appellant's injuries, and that the defendants had notice of the defect. *See Marinopoliski v. Irish,* 445 A.2d 339, 340 (D.C.1982).

Appellant Jackson testified that in 1982, approximately two years before the explosion and fire, her gas stove developed a leak. Her apartment would smell of gas, and periodically flames would shoot out of the stove when she turned on the burners. She said that she repeatedly complained to the resident manager about the stove from February through June of 1984. Washington Gas Light Company (WGL) twice inspected the stove, finding and repairing a leak on one of those visits. At that time, the WGL representative showed Jackson how to check the stove herself for gas leaks. On at least three other occasions, the stove was examined by maintenance personnel employed by the apartment complex, according to notations in the manager's log book.

On August 15, 1984, Jackson testified, she smelled gas early in the evening and sent her daughter to find the maintenance man, who came and checked the stove. Later that same evening, Jackson went to the kitchen and lit the stove. A flame leapt out and ignited her clothing. Jackson suffered severe burns on her neck, upper right arm, and shoulder. The doctor who examined her in the emergency room testified that the pattern of her injuries was consistent with a sudden flash of flame.

Jackson's mother, Frieda Harper, testified that she was present when the WGL representative found the gas leak and confirmed her daughter's account. A friend, Constantina Harris, said that she had seen flames spurt from the stove and had accompanied Jackson to make complaints to the management. Theodore Thomas, a maintenance mechanic for the apartment complex, testified that he had checked the stove on at least two occasions. Once he found a defective control valve, and another time he found a ticket from WGL stating that the stove had a leak in the gas line. Eddie Richardson, another maintenance worker, testified that he had examined Jackson's stove, found "a very bad gas leak," and recommended to the manager that the stove be replaced because it was "very dangerous." Jackson's daughter, Bernadine Johnson, corroborated her mother's version of what happened on August 15, confirming that she had notified the maintenance man on duty as her mother had instructed her.

In addition, Jackson presented the testimony of Robert Steinhoff, who was accepted by the court as an expert in the care, operation, and maintenance of gas stoves. Mr. Steinhoff testified that he had seen pictures of the stove taken the day after the fire and had formed an opinion that the stove was defective. He explained the factors which had led him to this conclu-

sion, and adhered to his opinion despite being shown a tag left by WGL which stated that the stove was working properly. On cross-examination Mr. Steinhoff agreed that it was reasonable to rely on WGL's evaluation of the stove's condition. He acknowledged that he had premised his opinion of how the fire occurred on two assumptions of fact which were later controverted by the defense expert: (1) that natural gas is heavier than air and can pool under the area of the burners, and (2) that the gas pressure in the line leading into the stove was three pounds per square inch. The defense expert, Calvin Leonard, a WGL employee with extensive experience in the field of gas appliance safety, testified that gas is in fact lighter than air and that the pressure in the gas line was only one-half pound per square inch.

 In granting the defendants' motion for directed verdict, the trial court gave dispositive weight to the fact that Mr. Steinhoff's assumptions were refuted by the testimony of Mr. Leonard. We hold that the court erred in doing so. The court wrote in its opinion:

> When the Plaintiff complained about her stove, the Defendants called in WGL, the undisputed experts in this field. The Plaintiff's expert agreed that it was reasonable to rely upon WGL, and there was no evidence to the contrary. If WGL was unable to find a problem with the stove, the Defendants surely were not on notice of a defect that needed correction.

There are two flaws in this reasoning. First, WGL personnel cannot be considered "undisputed experts" when the plaintiff's expert gives testimony which conflicts with that of the defendant's expert, a WGL employee. When a case turns on controverted facts and the credibility of witnesses, as this one does, it is peculiarly one for the jury. *Corley v. BP Oil Corp.*, 402 A.2d 1258, 1263 (D.C.1979). The fact that some of the witnesses may be experts does not alter this rule. The opinion of an expert must, of course, be grounded on evidentia-

ry facts in the record or reasonable inferences arising from those facts. *Spain v. McNeal*, 337 A.2d 507, 511 (D.C.1975). Nevertheless, the jury could reasonably have accepted Mr. Steinhoff's opinion in light of his extensive training and expertise in repairing gas ranges, even though the scientific basis for his conclusion was disputed by the defendants' expert. *See id.* at 511 n. 6 (weight to be given to expert's opinion is a jury question); *see also Ferebee v. Chevron Chemical Co.*, 237 U.S.App. D.C. 164, 170, 736 F.2d 1529, 1535 ("The case was thus a classic battle of the experts, a battle in which the jury must decide the victor"), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). The fact that the defendants' expert was a WGL employee and not a disinterested party [3] would make any reliance by the jury on the plaintiff's expert even more reasonable. "In general, although an opinion rises no higher than the level of the evidence and the logic on which it is predicated, it is for the jury, with the assistance of vigorous cross-examination, to measure the worth of the opinion." *District of Columbia v. Bethel*, 567 A.2d 1331, 1333 (D.C.1990) (citations omitted). The trial court should not have entirely disregarded the testimony of Mr. Steinhoff because, even though it was contradicted by that of Mr. Leonard, it was properly before the jury for whatever weight the jury might choose to give it.

 Second, the statement that the defendants "surely were not on notice of a defect that needed correction" is simply wrong. There was evidence that a WGL employee had checked the stove on July 23, barely three weeks before the fire, and corrected all the leaks. A jury could find, however, that it was not reasonable to rely on WGL's assurances that the stove was working properly because the defendants also knew that this particular stove, once repaired, did not stay repaired. The stove's continual return to a hazardous state was evidenced not only by the WGL visits but also by three repairs by the apartment's own maintenance workers, one

**3.** It was surely obvious to the trial court that if WGL's repair work was not properly done, WGL itself might have been subject to liability.

of whom concluded that the stove was "very dangerous" because of "a very bad gas leak" and recommended to the apartment manager that it be replaced. This evidence was sufficient to create a jury question regarding the defendants' notice of the possible hazardous condition of the stove. *See Marinopoliski v. Irish, supra,* 445 A.2d at 340–341.

Although the trial court mentioned only in passing the problems inherent in Jackson's testimony, we think it appropriate to address one of them briefly. Both experts were in agreement that if the events of August 15 had taken place precisely as Jackson described them, the accident could not possibly have happened. Specifically, Jackson said that the flame which shot from the stove was blue. According to the experts, a blue flame is an indication that a proper mixture of gas and air is being fed to a burner, whereas a flame with an excess of raw gas would burn red or yellow. Thus Jackson's own testimony tended to negate the presence of a defect. Nevertheless, her description of the flame and its color must be weighed in light of all the other evidence, including particularly the medical testimony. Inconsistencies in the testimony of any witness, or between the testimony of one witness and that of another, are properly left for the jury to resolve. *See Coates v. United States,* 134 U.S.App.D.C. 97, 99, 413 F.2d 371, 373 (1969). "A certain amount of inconsistency in the evidence is almost inevitable in any trial, but it rarely justifies

reversal"—or, in this instance, a directed verdict for one party. *In re A.H.B.,* 491 A.2d 490, 495 (D.C.1985) (citations omitted).

In ruling on a motion for directed verdict, a trial court "must take care to avoid weighing the evidence, passing on the credibility of witnesses, or substituting its judgment for that of the jury." *Corley v. BP Oil Corp., supra,* 402 A.2d at 1263 (citation omitted). The trial court in this case exceeded its limited role and drew conclusions based on the weight of the evidence and the credibility of witnesses. We must therefore reverse the judgment and remand this case for a new trial.

## II

The defendants filed a cross-appeal presenting three evidentiary rulings for our review in the event of a remand. Even assuming these rulings are properly before us,[4] all three concern the relevancy and admissibility of various items of evidence, and thus all three involve matters within the sound discretion of the trial court. Since these issues may or may not arise again upon remand, we see no reason to resolve them here. A trial court may give a ruling which is, in effect, "an advisory opinion on admissibility of evidence if offered at trial." *United States v. Mosby,* 495 A.2d 304, 306 (D.C.1985). Without express authorization, an appellate court may not, or at the very least should not. We decline to do so in this instance.[5]

---

4. We have considerable doubt whether the defendants may legitimately contest the rulings in issue at this time, given the jury's failure to reach a verdict. The defendants do not—and could not—challenge the necessity for a new trial in the event the trial court erroneously granted a directed verdict, as we have held it did. They cite no authority allowing a party to appeal in interlocutory fashion and seek review of evidentiary rulings by the trial court in such circumstances. This court has recognized an exception to the general rule of non-appealability of new trial orders before final judgment when the trial court has entered a conditional new trial order, in tandem with a judgment n.o.v., under Super.Ct.Civ.R. 50(c)(1). *Hines v. Safeway Stores, Inc.,* 379 A.2d 1174, 1176 (D.C. 1978). That exception has no relevance when a new trial is made necessary by the jury's failure to agree, and provides no authority in any event

for interlocutory appeal of evidentiary rulings made at the first trial.

We note that this case is decisively different from the more typical one in which a judgment has been entered on a verdict, and both parties appeal from that judgment claiming errors affecting that verdict. There was no verdict here, and hence the defendants are not faced with the risk that judgment may be entered against them if they do not cross-appeal. What may be permissible in other circumstances is something we need not address in this case.

5. One of the points raised by the defendants on appeal involves the collateral source rule. *See, e.g., District of Columbia v. Jackson,* 451 A.2d 867, 870 (D.C.1982). This may turn out to be a legal issue for the court to decide as a matter of law, rather than a mere discretionary matter of

 

### III

We hold that the evidence presented by the plaintiff was sufficient to go to the jury. The judgment of the trial court is therefore reversed, and this case is remanded for a new trial or for other proceedings consistent with this opinion.

*Reversed and remanded.*

---

relevancy or admissibility. Since the alleged collateral source in this instance is the District of Columbia, it may also be necessary for the court to hear from the District before ruling. *See also* D.C.Code § 3–506(c) (1988). In any event, we express no view on the matter.