**FRED A. SMITH MANAGEMENT CO., Martin J. Mesmer, Christopher Wallis, & Julie Cremin, Appellants/Cross-Appellees,**

v.

**Alexandra CERPE, Appellee/Cross-Appellant.**

**Nos. 07–CV–35, 07–CV–36.**

District of Columbia Court of Appeals.

Argued Sept. 4, 2008.

Decided Oct. 9, 2008.

---

908

Leslie Deak and David B. Lamb, Washington, for appellants/cross-appellees.

Keira M. McNett, Washington, with whom Mark Hanna and Elizabeth Ann Lawrence were on the brief, for appellee/cross-appellant.

Before WASHINGTON, Chief Judge, RUIZ, Associate Judge, and FARRELL, Associate Judge, Retired.

FARRELL, Associate Judge, Retired:

Alexandra Cerpe, formerly a resident property manager with Fred A. Smith Management Company (the Company), sued Christopher Wallis for sexual harassment/hostile work environment and the Company, Wallis, Martin J. Mesmer, and Julie Cremin for retaliatory discharge, both counts alleging violation of the District of Columbia Human Rights Act (DCHRA or the Act), D.C.Code § 2–1401.01 *et seq.* (2001). Cerpe sued as well for related common law torts including negligent hiring, training, and supervision. A jury returned verdicts against all of the defendants for retaliation, against Wallis for sexual harassment, and against the

Company for negligent hiring, training and supervision; it rejected Cerpe's common law claim of intentional infliction of emotional distress.[1] It awarded compensatory and punitive damages, and the trial judge later granted—but only partly—Cerpe's request for attorney's fees under the DCHRA. On appeal, the defendants challenge liability on all of the counts, as well as the award of punitive damages. Cerpe cross-appeals challenging the trial judge's reduction of the fee award requested.

We find no basis for disturbing the jury's verdict on the claims of sexual harassment and retaliation, and for its award of punitive damages, but we reverse the verdict for negligent hiring, training and supervision in light of *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564 (D.C.2007), decided after trial of this case. And we vacate and remand for further consideration the reduced award of attorney's fees.

## I.

The Company manages real property in the Washington Metropolitan area. At the time of the events at issue, defendant Mesmer was its president, defendant Wallis a vice-president and part owner, and defendant Cremin the executive vice-president and chief financial officer.

Evidence credited by the jury fairly allowed it to find that Wallis had begun importuning Cerpe sexually some six months after she was made resident manager at Wisconsin House, a property managed by the Company. Wallis was not then employed by the Company (he had worked for it previously), but less than a year later he was rehired and made Cerpe's immediate supervisor. According to Cerpe's testimony, Wallis continued making sexual advances, telling her, for example, that she "shouldn't be bashful

about anything because we are adults." He would sit in her office for hours at a time, stare at her, make sexually suggestive comments by asking about her personal life and revealing personal facts about his own, and comment about her looks and dress, saying things such as, "The way you look in that suit excites me—I'm going to have fantasies about you all day now." We set forth additional related evidence in discussing the punitive damage award, *infra*.

Cerpe complained of the sexual harassment to Mesmer in a phone call on May 3, 2002. (She testified that she had made repeated complaints to Mesmer before about Wallis, but had been told she had no choice but to work with him.) Although Mesmer admitted in reply that it was a "serious matter," on May 8 he instead gave Cerpe a letter of reprimand about her performance, instructing her that "any concerns you have pertaining to your duties or the building are to be brought to [Wallis's] attention," and that her claims of sexual harassment could be just a "misunderstanding." Cerpe described the pattern of sexual advances to Cremin, who had been tasked to look into the complaint, but who—the jury evidently found—conducted a perfunctory investigation, talking only sporadically with Wallis about the matter and neither recording nor taking more than cursory notes of these conversations. As we discuss further below in regard to punitive damages, the investigation turned instead to Cerpe's own performance, and on May 29, 2002, she was given a letter discharging her for cause based on supposed derelictions which the jury evidently found pretextual on the defendants' part.

---

1. The jury's separate verdict against Fred W. Smith individually for negligent hiring, training and supervision was later set aside by the trial judge, and is not at issue in this appeal and cross-appeal.

## II.

■ After the presentation of evidence, the defendants moved for a directed verdict on all remaining counts, *see* Super. Ct. Civ. R. 50(a),[2] and when the judge reserved ruling on the motion, *see id.* R. 50(b), they renewed it in writing after the jury had returned its verdicts. Cerpe's argument that the defendants may not now challenge the sufficiency of the evidence because they did not formally file a Rule 50(b) motion post-verdict has no merit: their renewed motion for directed verdict was in substance exactly that. *See, e.g., Marcel Hair Goods Corp. v. National Sav. & Trust Co.,* 410 A.2d 1, 5 (D.C.1979) ("To hold a party accountable for failing to interject a rule 50(b) motion when the trial court conducts a post-verdict hearing on a reserved rule 50(a) motion would be irrational.").[3]

■ Nevertheless, the defendants' challenge to the sufficiency of the evidence on the counts of sexual harassment/hostile work environment and retaliation must be rejected. "Only when there is no evidentiary foundation on which a reasonable trier of fact could base a reliable verdict is a directed verdict proper." *Jackson v. Condor Mgmt. Group, Inc.,* 587 A.2d 222, 224 (D.C.1991). Viewing the evidence in the light most favorable to Cerpe, *see id.,* we find ample evidence in the record supporting the jury's twin determinations that Wallis sexually harassed Cerpe and that the Company, as well as its officers—Mes-

mer, Wallis and Cremin—retaliated against her for complaining of the harassment.

■ Only one of the defendants' specific arguments requires brief discussion. They argue that any hostile work environment Wallis created did not cause Cerpe psychological injury, pointing to her own treating physician's testimony that other stressors in her life, such as an acrimonious relationship with a boyfriend, chiefly explained her depression or emotional distress at the relevant time. The defendants contend, citing language from *Howard Univ. v. Best,* 484 A.2d 958 (D.C.1984), and *Purcell v. Thomas,* 928 A.2d 699 (D.C. 2007), that a plaintiff suing for relief from a hostile work environment under the Act must prove psychological injury in order to survive a motion for judgment as a matter of law. Whatever support *Best* lent to that argument, however, has been eroded by intervening Supreme Court precedent construing Title VII of the Civil Rights Act of 1964,[4] from which this court draws guidance in interpreting the DCHRA. *See, e.g., Lively v. Flexible Packaging Ass'n,* 830 A.2d 874, 887 (D.C.2003) (en banc). Instead, as we stated most recently in *Nicola v. Washington Times Corp.,* 947 A.2d 1164 (D.C.2008), a plaintiff prevails on a hostile work environment claim by establishing:

> (1) that he is a member of a protected class, (2) that he has been subject to unwelcome harassment, (3) that the

---

2. Cerpe's claims for subterfuge, housing discrimination, and unpaid overtime had been dismissed before trial.

3. *Unitherm Food Sys. v. Swift–Eckrich, Inc.,* 546 U.S. 394, 126 S.Ct. 980, 163 L.Ed.2d 974 (2006), is no help to Cerpe, because there *no* post-verdict motion was filed challenging the legal sufficiency of the evidence. *See, e.g., id.* at 396, 406. Notably, in opposing the defendants' post-trial motion, Cerpe herself said that it "must be presumed to be a . . . Rule

50(b) motion"; it was the trial judge who thought this label "incorrect[ ]," as "it was a written motion for a directed verdict . . . requested by this Court because the Court [had] reserved its ruling at the time of trial."

4. 42 U.S.C. § 2000e *et seq.* (2003). *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

harassment was based on membership in a protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.

*Id.* at 1173 (quoting *Daka, Inc. v. Breiner,* 711 A.2d 86, 92 (D.C.1998)). In other words,

> a plaintiff must demonstrate both an objectively hostile or abusive environment, *i.e.,* one that a reasonable person would find hostile or abusive, and a subjective perception by the plaintiff that the environment is abusive. *But the plaintiff need not prove, in addition, that he or she suffered an actual psychological injury.*

*Lively,* 830 A.2d at 889 (quoting *Daka,* 711 A.2d at 93) (emphasis added) (in turn relying on *Harris* and *Meritor Sav. Bank, supra* note 4). Our analysis in *Purcell, supra,* reinforces the point that proof of psychological injury is a means—but only a means—by which sexual harassment may be shown to have been "severe and pervasive enough to affect a term, condition, or privilege of employment." *See* 928 A.2d at 710, 711. Also, Cerpe like any plaintiff in a tort action (including a statutory one) had to prove her damages, and thus to recover more than nominal compensatory damages for the sexual harassment she had to show some emotional impact on her in a case in which she had incurred no physical or economic injury at Wallis's hands.

The jury awarded Cerpe $25,000 in compensatory damages for Wallis's harassment. The evidence fairly supported that award. Under the DCHRA, the jury may compensate a plaintiff for embarrassment, humiliation, and indignity stemming from sexual harassment. *See* D.C.Code §§ 2-1403.13(a)(1)(D) & 2-1403.16(b); *Psychiatric Inst. of Washington v. District of Columbia Comm'n on Human Rights,* 871 A.2d 1146, 1153 (D.C.2005) (quoting DCHRA Guidelines for Payment of Compensatory Damages, 4 DCMR § 211.1 (2004)). Cerpe testified to the indignity and distress she experienced from Wallis's repeated sexual advances or innuendos. Her friend, Jane Sherman, confirmed "that something was bothering [Cerpe]" during the Spring of 2002 and that she was "agitated and upset." Dr. Plotnick, Cerpe's psychiatrist, likewise testified that during this time "psychosocial stressors at work," including "her ability to work with Mr. Wallis," had contributed to Cerpe's difficulty sleeping, trouble concentrating, and loss of appetite. The jury could readily infer from this testimony that Wallis's harassment had caused her emotional injury.

### III.

The jury awarded punitive damages against the Company, Wallis, Cremin, and Mesmer for retaliation, and against Wallis for hostile work environment sexual harassment. The defendants argue that Cerpe failed to prove the aggravated conduct or malicious state of mind that justified punishing them in this way.[5] We disagree.

■ An award of punitive damages must be supported "by clear and convincing evidence that the [tortious] act was accompanied by conduct and a state of mind evincing malice or its equivalent." *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 938 (D.C.1995); *see also Washington Med. Ctr. v. Holle,* 573 A.2d 1269,

---

**5.** Cremin's argument that she was not a proper party under the DCHRA has no merit, given our treatment of a similar issue in *Purcell,* 928 A.2d at 714–16. Moreover, in light of D.C.Code § 2–1402.62 (liability under the Act for aiding and abetting), and Cremin's own actions in the capacity of executive vice-president, her complicity in the charged retaliation easily presented a jury issue.

1284 (D.C.1990) (tortious act must be accompanied by "fraud, ill will, recklessness, wantonness, oppressiveness, wilful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury" to justify punitive damages). Regarding sexual harassment, Cerpe testified that Wallis repeatedly steered conversations with her to sexual topics, such as telling her that "all men want one thing" and "they just think about sex." He suggested he could be her "therapist" at lunchtime and, in response to her request for health insurance, told her that he would help her get it if she "compl[ied with] his demands." According to Cerpe, he frequently telephoned her at night, saying "that he missed me, that I should be watching out the window to see if he was there, and his car was parked there; that I should know who's watching me all the time ... that we should go out for a drink." Especially important for present purposes, these actions continued despite Cerpe's repeated requests for them to stop. She told Wallis she would not date a married man or co-worker and that she wanted a strictly "work relationship," but his importuning continued. Wallis's continued harassment despite Cerpe's pleas for him to stop was clear evidence of aggravation permitting the jury to find that he had acted maliciously.

 As for retaliation, Cerpe presented evidence allowing the jury reasonably to find that the investigation of the harassment was not genuine but, instead, was designed to establish pretextual reasons for her termination. As related earlier, five days after reporting Wallis's actions, Cerpe received a letter from Mesmer telling her to address "any concerns ... pertaining to your duties or the building" to Wallis himself, since "it could be a misunderstanding." When Cremin, the executive vice-president, interviewed Cerpe a week

later she told her, "If you want me to investigate this matter, you have to sign this waiver of investigation," presenting her with a pre-written waiver form. Although Cerpe testified—and the jury evidently believed—that she had described Wallis's improper actions in detail to Cremin,[6] she received a letter from Cremin, Mesmer, and Wallis soon afterwards (May 22) telling her that there was "nothing to substantiate" and that "each incident was a mutual conversation between two people that has been misrepresented to mean something else." Meanwhile (on May 15), Cerpe had received a letter from Cremin and Mesmer stating that she was being investigated for failing to rent car spaces and providing child care during work hours, and on May 29 Cremin and Mesmer gave her a letter terminating her for cause.

The reasons given for the termination, and their legitimacy, no doubt played a key role in the jury's finding of malice or its equivalent. The letter stated that, through Cerpe's dereliction, tenants had used four parking spaces without paying rent, and that Cerpe had "conspired to commit fraud" by submitting false time cards for the building engineer (daCosta), her then boyfriend. Cerpe, however, presented evidence that Wallis had known of the unrented parking spaces earlier, but took no steps to investigate until after she complained of the harassment. And Wallis admitted at trial that he had never given Cerpe a list of who rented spaces or of tenants' cars or license plate numbers; there was no job description for a resident manager at the time; and he had never warned her about the failure to monitor parking. As for babysitting during work hours, Mesmer admitted having told Cerpe that this could be "good PR," confirming her testimony that he had seen her with a child in the office before and told her it

---

**6.** Cremin admitted at trial that Cerpe had told her, "I just want him to leave me alone."

was "no problem" if it didn't interfere with her work.[7] But when the investigation of her performance began and Cerpe reminded Mesmer that he had allowed her to keep the child in the office, he replied, according to Cerpe: "[T]hat was then, this is now." Finally, as for the time cards, the jury learned that in December 2001 Mesmer knew that Cerpe had submitted time cards stating daCosta worked from 8:00 a.m. to 4:00 p.m. when he took classes from 6:00 a.m. until 12:00 noon, but merely told her to change the time cards and took no disciplinary action—until her termination at the end of May.

Altogether, the proximity of the discharge to Cerpe's complaint of harassment and the evidence that none of the proffered reasons for it had troubled management earlier support a jury finding that the officers contrived the reasons for firing her and thus were motivated by malice. *See, e.g., Pendarvis v. Xerox Corp.*, 3 F.Supp.2d 53, 57 (D.D.C.1998) (evidence that supervisor knew absences were excused and lied about reason for firing plaintiff created jury issue on punitive damages).

## IV.

 The jury also found the Company liable for common-law negligent hiring, training, and supervision of Wallis. In the meantime, however, this court decided *Griffin v. Acacia Life Ins. Co.*, 925 A.2d 564 (D.C.2007), which held that a common law claim of negligent supervision "may be predicated only on common law causes of action or duties otherwise imposed by the common law," *id.* at 576, and not "on a statutory violation of the DCHRA" such as the sexual harassment alleged in that case. *Id.* at 575; *see also id.* at 577. The reason, we explained, is that "[t]he cause of action for negligent supervision, derived from [the] standard negligent tort, recognizes that an employer owes specific duties to third persons based on the conduct of its employees," *id.* at 575,[8] but that "[n]otably not . . . among the duties of an employer that were recognized at common law is any duty to prevent the sexual harassment of an employee, when such conduct was not independently actionable under the common law [before] the enactment of the DCHRA." *Id.* at 576.[9]

Cerpe's lone attempt to distinguish *Griffin* is to argue that, unlike the plaintiff there, she also alleged the common law tort of intentional infliction of emotional distress, *cf. Griffin*, 925 A.2d at 576 n. 31 ("Appellant's claims of sexual harassment, while potentially actionable under the DCHRA, did not include any allegations of conduct independently tortious under the common law—such as . . . intentional infliction of emotional distress"), and presented enough evidence of that tort to survive a motion for directed verdict. Ultimately, however, the jury exonerated the defendants of that charge, and thus the only "duty" it found the Company to have breached was to prevent conduct proscribed by the DCHRA—a legally insuffi-

---

7. Wallis admitted having seen a child in the office at Wisconsin House between February and May 2002 and not having warned or reprimanded Cerpe about it.

8. These include "select[ing] employees competent and fit for the work assigned to them and . . . refrain[ing] from retaining the services of an unfit employee." *Griffin*, 925 A.2d at 575 (quoting *Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C.1951)).

9. At the same time, we recognized that common law claims for intentional infliction of emotional distress "may be predicated on the same conduct as a DCHRA claim," precisely because such claims do "not impose liability for a harm that is not a cognizable injury under the common law." 925 A.2d at 579 (internal quotation marks omitted).

cient predicate under *Griffin.* The mere allegation, and even presentation of a triable issue, of intentional infliction of emotional distress was not enough to avoid the reach of that decision, when the jury was unpersuaded by Cerpe's proof.

## V.

Following the verdict, Cerpe moved for an award of attorneys' fees and costs under D.C.Code §§ 2–1403.13(a)(1)(E) and 2–1403.16(b) (2001). She sought $466,296.00 in fees based upon the work of six attorneys and one student law clerk. The trial judge granted the motion in part, including in the award only the fees earned by Cerpe's two lead counsel, and reduced the fee by twenty percent because Cerpe had prevailed against only four of the five defendants. The judge further reduced the fee by three eighths because only three of the eight original counts had been submitted to the jury. Accordingly, the judge awarded a total of $158,661.63 in attorneys' fees.[10] She declined to apportion the fees and costs among the four defendants and held them jointly and severally liable for the entire award.

### A.

■ The defendants argue that the judge erred in holding them jointly and severally liable for attorneys' fees rather than apportioning them according to each defendant's culpability. We disagree. A plaintiff who proves a violation of the DCHRA may recover "reasonable attorney fees." *See* D.C.Code §§ 2–1403.13(a)(1)(E), 2–1403.16(b). In the context of federal civil rights litigation, the D.C. Circuit has recognized that "[t]o ensure that a private attorney general is fully compensated, 'it is frequently appro-

priate to hold all defendants jointly and severally liable for attorneys' fees in cases in which two or more defendants actively participated in" the violation of rights. *Turner v. District of Columbia Bd. of Elections & Ethics,* 359 U.S.App. D.C. 332, 339, 354 F.3d 890, 897 (2004) (quoting *Herbst v. Ryan,* 90 F.3d 1300, 1305 (7th Cir.1996)). Fees generated in litigation of claims "centered on a set of common issues against two or more jointly responsible defendants" the court said, "should be assessed jointly and severally." *Id.* at 340, 354 F.3d at 897 (citation and internal quotation marks omitted). We find that analysis persuasive, and hold that the trial judge did not abuse her discretion in refusing to apportion the attorneys' fees here.

■ The liability of the defendants arose out of a common nucleus of facts and issues, and the evidence supported a conclusion that Mesmer, Cremin, and Wallis, all officers of the Company, collaborated in a sham investigation of the sexual harassment and Cerpe's alleged misconduct. Mesmer asked Cremin to investigate and went with Cremin to give Cerpe the results of their investigations of both the sexual harassment and Cerpe's supposed misconduct. Wallis, besides engaging in the harassment, was present when Cremin met with Cerpe to discuss the results of the investigation and when Cerpe was terminated. Although only Wallis was charged with hostile work environment sexual harassment, Cerpe's attorneys had to prove the nature of the harassment and her reports of the harassment to support the retaliation claims against the other defendants. The defendants' liability thus arose out of a "common set of issues" and was not based on "truly fractionable" claims. *Id.* at 339, 354 F.3d at 898.[11] In

---

10. The judge also awarded, after correction in a subsequent order, costs of $20,267.84 which are not challenged here.

11. The defendants cite several cases recognizing that apportionment is permissible in some instances. *See Molnar v. Booth,* 229 F.3d 593, 605 (7th Cir.2000); *Herbst v. Ryan,* 90

sum, because the litigation arose out of a common set of factual issues and conduct—especially retaliation—in which all the defendants were involved, the judge did not abuse her discretion in holding the defendants jointly and severally liable for the fees. *Id.* at 340, 354 F.3d at 898; *Molnar, supra* note 11, 229 F.3d at 605.

## B.

Cerpe cross-appeals arguing that the trial judge erred in reducing fees based on the dismissal of three counts of her complaint, her failure to recover against one of the defendants, and the trial judge's determination that the number of attorneys was excessive. These claims have substantial merit.

 The trial judge has considerable discretion in determining the amount of attorneys' fees. *Lively,* 930 A.2d at 988. To establish a reasonable fee, the judge must calculate a "lodestar" amount by multiplying "the number of hours reasonably expended on the litigation" by the "reasonable hourly rate for the services rendered." *District of Columbia v. Jerry M.,* 580 A.2d 1270, 1281 (D.C.1990). One factor in that calculation is the "results obtained." *Blum v. Stenson,* 465 U.S. 886, 900, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (explaining that the "results obtained" factor "generally will be subsumed within other factors used to calculate a reasonable fee" rather than used to subsequently adjust the lodestar amount); *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Specifically, where "a plaintiff has achieved only partial or limited success," the judge may adjust the fee to reflect the level of success, *Lively,* 930 A.2d at 992 (quoting *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933), and in that regard should consider (1) whether "the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded," and (2) whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933; *see also F.J. Vollmer Co. v. Magaw,* 322 U.S.App. D.C. 193, 201, 102 F.3d 591, 599 (1996). The judge "may attempt to identify specific hours that should be eliminated, or ... may simply reduce the award to account for the limited success," *Lively,* 930 A.2d at 993 (quoting *Hensley,* 461 U.S. at 436–37, 103 S.Ct. 1933), by "across-the-board percentage cuts." *Id.* (quoting *Gates v. Deukmejian,* 987 F.2d 1392, 1399 (9th Cir.1992)).

 At the same time, though, we have rejected "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon,"

F.3d 1300, 1305 (7th Cir.1996); *Council for Periodical Distributors Ass'ns v. Evans,* 827 F.2d 1483, 1487 (11th Cir.1987); *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 959–60 (1st Cir.1984); *Jose P. v. Ambach,* 669 F.2d 865, 871 (2d Cir.1982). In deciding whether to apportion fees, the court may indeed consider "the relative active or passive role each defendant played," along with "fairness ... and the goal of reimbursing private attorneys general." *Molnar,* 229 F.3d at 605. But most of the cases defendants cite recognize and defer to the trial court's discretion on the issue. *See Molnar,* 229 F.3d at 605 (finding no abuse of discretion in holding defendants jointly and severally liable for fees); *Herbst,* 90 F.3d at 1306 (upholding apportionment of fees to state, whose policy was the "moving force" behind the litigation); *Ambach,* 669 F.2d at 871 (upholding apportionment of fees based on relative culpability); *but cf. Grendel's Den, Inc.,* 749 F.2d at 959 (adjusting trial court's equal apportionment to account for relative culpability, time spent litigating, and ability to pay). Only in *Council for Periodical Distributors Ass'ns* did the court reverse an award of joint and several attorneys' fees based on its determination that two of the defendants played only a minor role in one violation and "seemed ... to have little involvement" in the other.

which "provides little aid in determining what is a reasonable fee." *Id.* at 992 (quoting *Hensley,* 461 U.S. at 435 n. 11, 103 S.Ct. 1933). "[I]nstead the failure to prevail on [a particular] count must be considered along with the successful [count or counts] in determining [the claimant's] overall degree of success." *Goos v. Nat'l Ass'n of Realtors,* 315 U.S.App. D.C. 397, 399, 74 F.3d 300, 302 (1996). In *Lively,* we upheld a twenty-five percent reduction of fees where verdicts in favor of the plaintiff on three of the four claims submitted to the jury were vacated after post-trial motions, 930 A.2d at 992, pointing out that, although the trial judge had not conducted an in-depth analysis of the billing records, he "did not simply take a mathematical approach" which would have resulted in a seventy-five percent reduction in fees. *Id.* at 993. Such a percentage cut to reflect less than complete success is acceptable, so long as it is tied to the overall degree of success and not a mere mathematical reduction in proportion to the number of unsuccessful claims.

■ Here, the complaint initially alleged eight counts, including claims for subterfuge, housing discrimination, and unpaid overtime, which were dismissed before trial. The judge dismissed the housing discrimination count because Cerpe's eviction would create merely additional damages relevant to the retaliation claim rather than a separate cause of action. Cerpe argued that the subterfuge count had been based on Cremin's misleading statements when she asked Cerpe to waive the investigation, but the judge likewise found this not to constitute a separate claim. At the same time, the judge acknowledged that most of the original eight counts, aside from the complaint for unpaid overtime, "were factually related," but she nonetheless reduced the claim by three-eights because only five of the eight counts had been submitted to the jury.[12] This reduction of the fee by three-eighths reflects the approach we have rejected. Proof of the facts underlying the subterfuge and housing discrimination claims was relevant to Cerpe's claim for retaliation and related damages, as the judge recognized. What the judge had to do, therefore, was consider whether Cerpe's overall degree of success (prevailing on the interrelated retaliation and hostile work environment claims) justified the hours spent and the fee requested; a mathematical reduction of the fees in proportion to the number of counts not submitted to the jury was not a proper exercise of discretion. On remand the judge may eliminate hours spent on the unsuccessful claims or else determine a percentage reduction that reflects Cerpe's overall success.[13]

■ Cerpe further argues that the judge erred in reducing her fees by one fifth because she had not prevailed on any of her claims against Fred W. Smith individually. This adjustment is also problematical. Cerpe did not allege any individual wrongdoing by Smith, who had minimal involvement with the Company and was alleged to be liable based only on his role as a "co-employer[ ]" of Cerpe, a fact to which the parties stipulated. Accordingly, little additional attorney effort was required to attempt to prove Smith's liability. The judge should again determine on remand how Cerpe's failure to recover against Smith related to her overall success, and the hours reasonably expended

---

12. Although the jury returned verdicts for Cerpe on only three counts, the judge did not further reduce the fee because of her finding that all five counts submitted to the jury were factually related.

13. In deciding whether the fees should be reduced to reflect Cerpe's overall success, the judge may consider this court's reversal on the count of negligent supervision.

in pursuing her successful claims, rather than mechanically reducing the fee by one fifth.

Finally, Cerpe argues that the judge abused discretion in reducing the fees based on the judge's perception that the number of attorneys employed was excessive. One court has stated:

> The retaining of multiple attorneys in a significant, lengthy employment discrimination case ... is understandable and not a ground for reducing the hours claimed. The use in involved litigation of a team of attorneys who divide up the work is common today for both plaintiff and defense work. While *Johnson [v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974),] recognizes the possibility of unnecessary duplication for which double compensation should not be granted, a reduction is warranted only if the attorneys are *unreasonably* doing the *same* work. An award for time spent by two or more attorneys is proper as long as it reflects the distinct contribution of each lawyer to the case and the customary practice of multiple-lawyer litigation.

*Johnson v. University College of the University of Alabama in Birmingham,* 706 F.2d 1205, 1208 (11th Cir.1983) (emphasis in original; citations omitted); *see also A.J. ex rel. L.B. v. Kierst,* 56 F.3d 849, 863–64 (8th Cir.1995) (rejecting reduction of fees where trial court determined that only one attorney was necessary and failed to consider whether work of additional attorneys "improperly duplicated" the work of others). Here, after concluding that the case had not been a "complex" one, the trial judge eliminated fees claimed by all but two of Cerpe's attorneys, Elizabeth Lawrence and Mark Hanna, reasoning that to "[u]tiliz[e] just one attorney of the caliber and experience described [in Lawrence's affidavit] would have been more than adequate to handle the plaintiff's

case" (though, "in an abundance of caution" the judge assumed that "it might be efficient and effective to have a junior attorney assist in some phases of the litigation"). This elimination of hours, however, did not purport to consider whether the work done by the attorneys besides Lawrence and Hanna had been duplicative or redundant; it rested simply on the finding that two (or two "plus") attorneys were enough. Moreover, the judge relied on the fact that counsel for the defendants had claimed fewer hours for similar tasks, a basis courts have recognized to be a tenuous one for reducing fees. *See Ferland v. Conrad Credit Corp.,* 244 F.3d 1145, 1151 (9th Cir.2001); *Harkless v. Sweeny Independent School District,* 608 F.2d 594, 598 (5th Cir.1979); *Mirabal v. General Motors Acceptance Corp.,* 576 F.2d 729, 731 (7th Cir.1978). On remand, the judge should consider whether the fees claimed by the other attorneys and law clerk represented inefficiency or duplication of work performed by Hanna and Lawrence, or whether those fees represented a "distinct contribution" to the litigation. *Johnson,* 706 F.2d at 1208.

## VI.

Accordingly, we reverse the verdict for negligent hiring, training, and supervision, and vacate the award of attorneys' fees and remand that issue for further consideration in light of the principles discussed. In all other respects, we affirm the judgment of the Superior Court.

*So ordered.*